## SCHWAB SAFE & LOCK CO. v. SNOW.

### No. 2592. Decided April 17, 1914 (140 Pac. 761).

SALES—PURCHASES FOR RESALE—ACCEPTANCE OF ORDERS—FAILURE TO
DELIVER—LIABILITY. The parties having entered into an agree-
ment, whereby defendant was to buy and resell safes made
by plaintiff, and plaintiff was to supply them for such purpose,
and make prompt shipments of all sold and ordered by defend-
ant, and plaintiff, on defendant complaining of delay in ship-
ping safes of a certain style, and asking if he was to under-
stand it would be useless to take any more orders for them,
having replied that it would endeavor to fill his orders there-
for as quickly as possible, and, on orders being subsequently
made therefor, acknowledged them, and stated they would re-
ceive its prompt attention, and that shipments would be made
as soon as possible, there was an unqualified acceptance of the
orders, making it liable to defendant for his loss of profits on
sales, because of its failure to make the shipments.

APPEAL from District Court, Third District; *Hon. F. C.
Loofbourow,* Judge.

Action by the Schwab Safe & Lock Company against O.
G. Snow.

From a judgment granting a non-suit on defendant's coun-
terclaim, he appeals.

REVERSED AND REMANDED FOR NEW TRIAL.

*Hutchinson & Bucher* for appellant.

*Stephens, Smith & Porter* for respondent.

STRAUP, J.

The plaintiff sued to recover a money judgment on a
blanket charge "for goods, wares and merchandise sold and
delivered," of which it alleged a balance of $561.72 remain-
ed due and unpaid. The defendant denied the indebtedness,

and pleaded counterclaims. The case was tried to the court. The issues tried relate to those presented by the counter-claims. As to them the court granted a nonsuit, and then rendered a judgment for the plaintiff in the sum of $561.72. The defendant appeals. The principal assignment involves a review of the ruling granting the nonsuit. · The relation of the parties and the real transactions between them are shown by a somewhat voluminous correspondence. We can but give a substance of such parts of it as are deemed by us the most important.

In brief, the case is this:

In April, 1906, the defendant, residing in Salt Lake City, wrote the plaintiff, residing in Lafayette, Ind., where it was engaged in manufacturing and selling safes, that one of its agents had conferred with him and was anxious to interest him in the safe business. He stated that, if he went into the business, "it would be with a view of putting a few first-class agents in the field and pushing the business, and, as traveling expenses are high in the west" requested "the very best prices for 'spot cash;' " and further requested catalogues and price lists quoting "your very best prices on the various kinds of safes." The plaintiff replied: "If you are inclined to handle our line of safes making us some good sales, we have no objection in furnishing catalogues and price lists quoting you our 'spot cash' with order prices." A price list was inclosed, and catalogues sent showing some twenty different grades of sales and price lists of each. Further correspondence followed, in pursuance of which the defendant appointed agents and sent them out to solicit orders. Contracts of sale were made between the defendant and the purchasers. The orders were sent to the plaintiff, who acknowledged receipt of them, and made shipments direct to the purchasers, but charged the safes to the defendant.

In May, 1906, after several orders had been received and acknowledged by the plaintiff, and some delay in shipments experienced, the defendant wrote the plaintiff:

"What I do want, however, is prompt delivery, and if that cannot be done I do not care to sell any.of them. I naturally supposed that your company kept them on hand ready for shipment as soon as ordered and paid for. The reason of making this remark is owing to the fact that in your answer to my order you simply say you have 'entered the order,' but say nothing about when the safes will be shipped, so for that reason I am at a loss to know whether you have them on hand, or whether I will have to wait till you make them. You will appreciate the necessity of- prompt delivery when your attention is called to the fact that I have to advance the agents their expense and part of their commission and then have to advance the money to buy the safes, and then allow the purchasers to pay in small monthly installments after the safe has been delivered, whereby, you can readily see, a good deal of money will necessarily be tied up in the business anyway, and if I am obliged to wait for the safes to be made after I have paid for them, then in that event there is not enough margin in the proposition to induce me to handle them. Please advise me on this point by return mail."

To this the plaintiff replied:

"*We can make prompt shipments,* but you must understand that safes must be lettered and varnished, which will consume a few days, especially as the varnish must be thoroughly dried before shipping in order to avoid the packing from adhering to the safes. We sometimes are short in some sizes, and consequently your orders are delayed for this reason, but we aim to carry all sizes in stock and make prompt shipments. *We assure you that no other safe manufacturers can make prompter shipments than we do,* and you will be convinced that our dealings with you are receiving our best attention, when we have proceeded any great extent with you in a business way."

The defendant continued to take orders, sending them to the plaintiff, who acknowledged receipt of them, and made shipments accordingly.

In September, 1906, the defendant wrote the plaintiff that he had been in the business long enough to satisfy him

that by pushing it he could make a success of it, and asked that he be given "an agency contract" covering a designated territory—Utah, Idaho, Montana, Washington, Oregon, Nevada, and Arizona—and stated that, if protected in such territory, he could "appoint as many agents as the business will justify, and when they travel and canvass the various places I will eventually get some benefit out of the advertising they do from time to time, and of course, that will also benefit you as well. You will undoubtedly concede the fact that it requires a great deal more and harder work to introduce an unknown commodity into any community than it requires to sell an article well and favorably known throughout the country. Therefore it would not be the fair thing for me to work and spend a great deal of money in building up a trade, and, when I get it well upon the highway of success, then allow others to invade my territory and thus reap the benefit of the means and time I have spent in introducing the proposition therein. . . . My plan would be to establish an agency of live, active, and energetic men, capable of getting business, so as to make it interesting as well as profitable to all parties concerned. It may not be amiss to say that I have had a great deal of actul experience in handling agents in different lines of trade, so that is not at all new experience to me so far as that is concerned."

To this the plaintiff replied:

"If you continue to send us your business, we have been receiving in the past, we do not see why you should not go ahead and continue to build up your business, *as we surely will give you all the protection possible.* We have several hardware dealers representing us in one or two of the states you named, but we do not believe they would interfere with your business in the least. We have had several inquiries from your city, but as long as you can handle our goods and give satisfaction we do not see why any change should take place. Your orders are being shipped out as quickly as possible, our factory being very much congested with orders at this season of the year, to say nothing about our being unable to get some material from the eastern markets, which

has been somewhat of a hindrance to us in filling orders. *We now have a good supply of everything necessary for safe manufacturing, and if you can keep your orders coming in regularly, we will succeed in getting them out with very little delay."*

Thus the defendant in the territory named continued with his agents in the field selling safes, and sending in the orders to the plaintiff to be filled.

In December, 1906, the plaintiff wrote the defendant that one from Montana wrote it "for a price on our safes, and we referred him *to you as our representative in that territory,* and we would suggest that you write him, and, if he wishes to sell safes as a dealer, would suggest that you quote him as low a price as possible so he can realize a profit."

It was further testified to by the defendant that he had about eight agents traveling and selling safes in Utah and in the other named states, and that he sold about 200 safes, which had been shipped to the purchasers by the plaintiff on sales made by him and upon his orders sent to it.

After the defendant had been engaged in the business for something over a year, a controversy arose between him and the plaintiff as to the plaintiff's delay in making shipments of safes sold by him and orders sent to it, especially with respect to the grade or kind of safe known as number eighty. In some instances there were delays of more than five months. Purchasers complained of the delay, and in some instances their orders were canceled. Considerable correspondence passed between the plaintiff and the defendant with respect to this.

In May, 1907, the defendant wrote the plaintiff:

"When we wrote for information as to when the shipments would be made we were in hopes of getting some definite information regarding the matter, but must confess that we are about as much in the dark as we were before the inquiry was made, for we don't know whether it takes a year to make patterns or whether a month, week, or a day, we really hope, however, that it don't require much time to make them, for we have recently sent you several orders for

the same kind of a safe as the Stewart. As to substituting other kinds for the number eighty's, am sorry to have to say that it would be impossible to do that, as they are desired for special purposes in every instance when ordered. Are we to understand that it will be useless to take any more orders for the number eighty? And does that also apply with equal force to numbers 110, 130, and 160? As it costs a good deal of hard cash outlay in getting orders, you will readily concede that we are certainly entitled to know what the reasonable prospects are for having the orders filled within a reasonable time. Therefore please give us definite information as to what numbers we ought to discontinue to get orders for, if any."

The plaintiff replied:

"It takes more time to get out new patterns than you have any idea; especially when you are about five hundred orders behind all the time. We will endeavor to fill your orders on number eighty safe as quickly as possible, but we will have to build them entirely by hand."

Later in that month the plaintiff wrote the defendant: "We would ask you to refrain from taking orders for number eighty safes as much as possible, as we are not in a position to furnish them, only on long time delivery." But within a few days after that the plaintiff in acknowledging receipts of orders for number eighty safes, stated: "We will endeavor to fill your orders for number eighty safes as quickly as possible." Still later in that month, referring to further orders sent it by the defendant, the plaintiff wrote him: "It is a question of just when we can fill your order for a number eighty safe, but we would advise that you hold off your customer as long as possible, and if we can make shipment all right and well. We dislike very much to cancel this order, and will do the best we can towards making shipment." But in June following, again acknowledging receipt of three orders for number eighty safes, the plaintiff wrote the defendant that the orders "have been entered for prompt attention, shipments moving at earliest date possible."

So the defendant continued in the business, as before, selling safes, among them number eighty, and sent in his orders to the plaintiff, all of which were acknowledged by it, with statements to the effect that the orders had been entered, would receive prompt attention, and that the shipments would be made as soon as possible. Delays, however, continued in the shipments, complaints made by purchasers of nondeliveries, and in some instances the plaintiff canceled orders theretofore received and acknowledged by it for number eighty safes. In March, 1908, the defendant wrote the plaintiff: "When will you be able to furnish any number eighty safes?" The plaintiff replied. "In regard to number eighty safes, desire to say that we have a new pattern in process of construction, and for the present we can furnish you about one per week. It will not be long before we can furnish you with any quantity of these safes you can use."

The defendant sold ten number eighty safes, one 110, and one 160, orders for which had been sent to the plaintiff and acknowledged by it, but of which shipments were not made or delayed, and the orders canceled. Because of the plaintiff's failure and delay in making shipments, the defendant, in the summer of 1908, ceased to do business with it. He then owed the plaintiff a balance unpaid on safes which had been sold and delivered amounting to $561.62. The subject-matter of his counterclaims relates to his loss of profits as to sales made by him of the twelve safes referred to and which the plaintiff failed to deliver.

The court considered the transactions and the rights of the defendant from the viewpoint of whether the orders sent the plaintiff and received by it with respect to the safes sold by the defendant, and not delivered by the plaintiff, constituted, as between them, contracts of sale. The court held they did not, because of an insufficient acceptance of the orders by the plaintiff; that its acceptances—your orders received; have been entered; will receive prompt attention; shipments will be made as soon as possible—were not sufficiently specific and direct to constitute in law an unqualified acceptance. We think the court erred in that.

Under the circumstances disclosed and the shown relation between the parties, the defendant's sending in the orders and the plaintiff's acknowledging receipt of them, stating they had been entered, would receive prompt attention, and that shipments would be made as soon as possible, sufficiently show an acceptance. In the next place, we think the rights of the defendant are to be considered and measured from a broader viewpoint. The relation of the parties is shown to be something more than that of a mere vendor and vendee. A relation is shown whereby the defendant undertook to buy and resell plaintiff's safes, and the plaintiff to furnish and supply them for that purpose. One thing was very clearly understood between them, when the defendant entered upon the business, that the plaintiff was to make prompt shipments and deliveries of all safes sold and ordered by him. The necessity of that was fully explained to the plaintiff. It in clear terms promised to make prompt shipments, and assured the defendant that it could do so. That promise applied to all safes listed, including safe number eighty. True, after the defendant had entered upon the business and had his agents in the field, the plaintiff requested the defendant to refrain as much as possible from taking orders as to safes number eighty, and to hold off his customers as long as possible; but it at no time directed him not to take orders for that safe. When the defendant wrote the plaintiff in May, 1907: "Are we to understand that it will be useless to take any more orders for the number eighty, and does that also apply to numbers 110, 130, and 160? . . . Give us definite information as to what numbers we ought to discontinue to get orders for, if any"—the plaintiff replied, "We will endeavor to fill your orders on number eighty as quickly as possible." And, when it thereafter received orders for safes number eighty, it did not decline to accept them, but acknowledged receipt of them, stated that they would receive its prompt attention, and that shipments would be made as soon as possible. Because of its failure to make the shipments the defendant, as to those sales, lost his profits.

We think the case comes within the principles announced in *Jordan, Marsh & Co. v. Patterson Co.,* 67 Conn. 473, 35 Atl. 521, *Crane v. Barron,* 115 App. Div. 196, 100 N. Y. Supp. 937, *Manier v. Appling,* 112 Ala. 663, 20 South. 978, *Parlin & Orendorff Co. v. Boatman,* 84 Mo. App. 67, *Jenness v. Mt. Hope Iron Co.,* 53 Me. 20; and we are of the opinion that the defendant, as to his counterclaims, adduced sufficient evidence to make a *prima facie* case; and hence the court erred in granting the nonsuit. The defendant, on his counterclaims, is entitled to a trial on the merits. He has not had that.

The judgment is reversed, and the cause remanded for a new trial; costs to the appellant.

McCARTY, C. J., and FRICK, J., concur.